51 CCPA
**Application of Alan B. HUELLMANTEL.**
**Patent Appeal No. 7022.**

United States Court of Customs
and Patent Appeals.
Dec. 12, 1963.

Joseph K. Andonian, Kalamazoo, Mich. (Eugene O. Retter, Washington, D. C., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of claims 1–13 of application serial No. 560,894, filed January 23, 1956, entitled "Composition of Matter."

The invention relates to anti-inflammatory drug compositions and is sufficiently indicated by claims 1, 4, and 8 which are representative:

1. A therapeutic composition comprising a salicylate and a member selected from the group consisting of prednisone and prednisolone.

4. A therapeutic composition in dosage unit form comprising from about 150 to about 600 milligrams of salicylate and from about 0.25 to about 2.5 milligrams of a member selected from the group consisting of prednisone and prednisolone per dosage unit.

8. A therapeutic composition comprising acetylsalicylic acid, prednisolone free alcohol, ascorbic acid, d-pantothenyl alcohol, calcium carbonate, magnesium carbonate, and magnesium oxide.

The salicylate may be metal salicylate salts, esters of salicylic acid, or acetylsalicylic acid (aspirin). Prednisone and

prednisolone are steroids, more particularly derivatives of cortisone.[1] Appellant's specification states:

> Prednisolone has exhibited anti-inflammatory effects in animals * * * and in man * * *. Similar activity has also been shown for prednisone in man * * *. It has been found, however, that these hormones produced undesirable side-effects * * * at effective therapeutic dosages * * *.

> It has also been reported that salicylates are effective as anti-inflammatory agents in man * * *. These compounds, however, also produce undesirable side-effects * * at effective anti-rheumatic dosages * * *.

> It has now been unexpectedly found that the combination of these anti-inflammatory steroids and salicylates possesses greater anti-inflammatory activity with less side-effects than the sum of the activity of the individual agents when used alone. The unexpected properties of this combination spring largely from the fact that the side-effects of each drug are counteracted by the presence of the other. Thus, each active ingredient possesses desirable anti-inflammatory effects accompanied by undesirable hormonal side-effects when used alone; but when the active ingredients are combined, quite remarkably the anti-inflammatory effects are retained or potentiated while the hormonal side-effects are largely dissipated.

> * * * * * *

> In general, the composition of the present invention can be prepared by simple intermixture of the principal active ingredients in a suitable diluent for the intended use. * * * Oral compositions can take the form of tablets, powders, capsules, liquid suspensions, solutions, or other dosage forms which are particularly suited for oral administration.

> * * * * * *

> According to the concept of the present invention it is preferred to use smaller quantities of each of the essential active ingredients in the composition than when each such active ingredient is used alone to obtain a particular therapeutic response. Thus, although dosage unit forms of prednisone and prednisolone usually contain from one to five milligrams of the steroid, the dosage unit form of the present composition preferably contains from about 0.5 to 1.5 milligrams of steroid. * * * Similarly, the aspirin content of the present dosage unit form preferably varies between about 200 and 400 milligrams, although as little as about 150 milligrams and as much as 600 milligrams can be used.

The sole ground of rejection is unpatentability over the following prior art:

American Druggist, January 31, 1955, p. 44 [disclosing "Salcort," hereinafter defined].

Holt et al., Lancet, 267:6849, December 4, 1954, pp. 1144–1148.

Bunim et al., Journal of the American Medical Association, 157:4, January 22, 1955, p. 311.

Drug Trade News, 30:3, January 31, 1955, pp. 37, 54.

American Druggist discloses "Salcort," as a commercial tablet composition for oral treatment of rheumatic

---

1. Appellant's specification states that the terms "prednisone" and "prednisolone" as used in the specification mean not only the alcohols delta-1-cortisone and delta-1-hydrocortisone, respectively, but also the therapeutically active 21-esters thereof. When the free alcohol is intended, it is referred to as "prednisone free alcohol" or "prednisolone free alcohol."

Prednisone and cortisone differ solely in that the former has a *double* bond between the 1 and 2 positions of the steroid nucleus, the latter a *single* bond. Prednisolone and hydrocortisone differ in the same way.

fever, rheumatoid arthritis, bursitis, rheumatoid spondylitis and related diseases, comprising cortisone acetate, sodium salicylate, calcium ascorbate and an antacid. Holt et al. disclose comparative results in the treatment of rheumatic fever with (a) a small dose of salicylate (b) a large dose of salicylate and (c) a large dose of salicylate mixed with cortisone. Holt et al. state that the combined salicylate-cortisone treatment was attempted "in case there might be a synergistic action between them." Both Bunim et al. and Drug Trade News disclose prednisone and prednisolone as physiologically more potent delta-1 analogs of cortisone and hydrocortisone, also known in the art respectively as prednisone and prednisolone.

The rejection is stated by the board as "lacking invention over 'Salcort' and the Holt et al. publication in view of the Drug Trade News or Bunim et al. references." Although not specifically stated, 35 U.S.C. § 103 is obviously the statutory basis. The sole issue before us is, therefore, obviousness of the claimed composition in view of the cited prior art.

The Patent Office position is that one skilled in the art, knowing of the "Salcort" composition and knowing of the results of the combined therapy of Holt et al., would obviously *substitute* the later-discovered more physiologically active prednisone or prednisolone for cortisone in "Salcort" to produce a better anti-inflammatory composition. Improved results, conceded to be shown by appellant, are considered immaterial in the Patent Office view since the composition is obvious. As stated by the board,

> "We are of the opinion that it would readily occur to one skilled in this art that these more potent steroids could be substituted for cortisone in the 'Salcort' combination. Since it is known that the steroids employed by appellant have the same effect as cortisone, except for being more potent, it appears to us that it would be obvious to at least try to substitute those steroids

for cortisone in combinations in which cortisone had been employed such as in the 'Salcort' composition.

> "The fact that the claimed composition produced certain heretofore undisclosed advantages does not, in our opinion, render the claims patentable. Since it is our view that the claimed combination is clearly taught by the prior art. See In re Libby, 45 CCPA 944; 1958 C.D. 324; 118 USPQ 94; 733 O.G. 294; 255 Fed. (2d) 412; and In re Gauerke, 1937 C.D. 119; 475 O.G. 3; 24 CCPA 725; 86 Fed. (2d) 330. We do not consider the contentions relative to the fact that Holt et al. did not employ controls or that the results there may have been considered somewhat uncertain material to our conclusion. Obviousness does not require absolute predictability. In re Moreton, 771 O.G. 621; 48 CCPA 928; 288 Fed. (2d) 940; 129 USPQ 288."

Further, the examiner had previously stated in his answer,

> "The showings of record attempting to establish synergism in the claimed compositions are conceded to show improved results over the 'Salcort' composition or Holt et al. combination therapy. * * * It is not believed that the issue here turns on the ability of an investigator to predict that the particular claimed steroids will be operable to give the improved result, but rather whether there is any reason to suppose that such steroids, generally accepted in the art as being themselves improvements over cortisone acetate, would not be suitable. Applicant has not advanced any reason or presented any evidence that the prior art taught against prednisone or prednisolone in lieu of the cortisone of the 'Salcort' or Holt et al. references.

> "Therefore it would be expected that where the later available analogs of cortisone are known to be many times more physiologically ac-

tive and otherwise to be preferred for lack of side effects over cortisone, that antirheumatic compositions containing said later available analogs would also be more active and have greater acceptability."

Appellant argues that the Patent Office position is based on oversimplification of the problem of finding new antiinflammatory agents with minimal side effects; that the mere existence of salicylate-cortisone tablets does not suggest substituting for cortisone the later-discovered more potent cortisone derivatives, prednisone and prednisolone; and that synergism attained by the new composition is unexpected.

We affirm the rejection, however, since we believe the subject matter of the invention considered as a whole would have been obvious to one skilled in the art at the time the invention was made. But we do so on a rationale somewhat different from that of the Patent Office.

Both the board and the solicitor consider the fact of superior pharmaceutical properties immaterial to determining obviousness. The board states, "The fact that the claimed composition produced certain heretofore undisclosed advantages does not, in our opinion, render the claims patentable. Since it is our view that the claimed combination is

clearly taught [2] by the prior art." The solicitor states, "Whether the art recognized that the claimed combination 'might demonstrate concert of action of its elements in the significant area of lessened adrenal atrophy' is immaterial, since the sole issue in this appeal is whether it would have been obvious to substitute prednisone or prednisolone for cortisone in the combination of Salcort or Holt, and not whether it would be obvious that such substitution would produce lessened adrenal atrophy."

We do not entirely agree with this framing of the issue. This court has frequently stated that properties of chemical compounds must be considered in determining obviousness under 35 U.S.C. § 103. In re Lambooy, 300 F.2d 950, 49 CCPA 985; In re Petering and Fall, 301 F.2d 676, 49 CCPA 993; In re Papesch, 315 F.2d 381, 50 CCPA 1084. We think this also applies to such compositions as we have here, i. e., admixtures of two or more compounds. Therefore, the issue of obviousness in this case can be resolved only after considering the differences between the prior art and the claimed compositions chemically *and* in view of their pharmaceutical properties.[3] To do so we consider the cited references and what we believe they would teach one skilled in the art.

2. Apparently the board means "clearly *suggested*" since the prior art does not anticipate the claims under 35 U.S.C. § 102(a). The nature of the rejection manifestly indicates that 35 U.S.C. § 103 was intended by the board to be the basis for the rejection. It would have been helpful, however, if the statutory basis had been expressly stated.

3. We feel compelled to comment on the Patent Office analysis by which patentability under 35 U.S.C. § 103 is herein determined. The examiner concedes that appellant's composition "shows improved results." The board accepts this as "fact," but concludes it is immaterial since "it is obvious *to at least try*" (our emphasis) to substitute one steroid for another in the prior art composition. We believe this reasoning, insofar as it negates consideration of properties in de-

termining obviousness under section 103, flies in the face of the plain language of the statute as interpreted by this court in Lambooy, Petering et al., and Papesch, cited supra. Section 103 says, inter alia, "the subject matter as a whole would have been obvious * * *." Nothing is said about "obvious *to try*." Consideration of the subject matter "as a whole" in chemical cases requires comparison of properties, pharmaceutical or otherwise, as well as comparison of chemical structures.

We do not mean to imply that every variance in property of a new compound or composition will tip the balance for patentability where otherwise closely related compounds or compositions are involved. However, all relevant property differences *must be considered* in the light of the facts of each case in the determination of statutory obviousness.

Appellant agrees that cortisone-salicylate mixtures are anti-inflammatory agents, and that prednisone and prednisolone possess anti-inflammatory activity three to four times as great as cortisone or hydrocortisone. The disagreement revolves around interpretation of Holt et al. Appellant contends that Holt et al. do not "suggest" substitution of prednisone or prednisolone for cortisone, since their data are "inconclusive" and warn of "toxic complications." Further appellant argues that one skilled in the art, upon finding that prednisone and prednisolone possess enhanced potency without increased side effects, would cease looking for better anti-inflammatory agents.[4]

We do not agree with appellant's interpretation of Holt et al., pertinent portions of which state (all emphasis ours):

"When planning this new study [including combined salicylate-cortisone therapy] we could find no report of combined treatment of this kind.

"We expected to reach no definite conclusion for at least five years; but the early results obtained by *combined use of cortisone and salicylates* in high dosage seemed to us so unusual that we are publishing a preliminary account of our experience so that others may consider it.

\*   \*   \*   \*

"These results indicate that the *combined treatment* produced a greater fall in the E.S.R.[5] than did salicylates alone in either high or low dosage. The differences were of *statistical significance.* \*   \*   \*

\*   \*   \*   \*

"It was because of the value of cortisone alone and of salicylates alone in rheumatic fever that we de-cided to try the effect of combining these two drugs, *in case there might be a synergistic action* between them. Since then we have found one report of the systematic use of this combination.

\*   \*   \*   \*

"\*   \*   \* in all cases receiving the combined treatment there was a very satisfactory and prompt clinical improvement, with a \*   \*   \* clearing of the arthritis, and other signs and symptoms other than cardiac murmurs. All the patients were symptom-free when treatment was discontinued.

"Our figures show that the E.S.R. fell *significantly more quickly when the drugs were used in combination* \*   \*   \*.

\*   \*   \*   \*

"The E.S.R. fell significantly more quickly in the children receiving *cortisone and salicylates* than in the other two groups. \*   \*   \* There was a correspondingly rapid improvement in the clinical condition of the patients in the *combined-treatment* group.

\*   \*   \*   \*

"We do not wish to create the impression that the combined treatment is easy to give, or that it is a 'cure' for rheumatic fever. One of us (Holt 1954) will describe elsewhere the toxic complications which we have observed \*   \*   \* in achieving a high serum-salicylate level."

We think Holt et al. plainly suggest combined therapy. The authors' conservatism in reporting test results does not vitiate the clear teaching that combined therapy works.

---

4. Appellant himself rebuts the latter argument, his specification stating at page 1, "It has been found, however, that \*   \*   \* [prednisone and prednisolone] produced undesirable side-effects such as sodium retention, mental disturbances, Cushing's syndrome, inhibition of pituitary-adrenal axis, and gastric disturbances at effective therapeutic dosages

\*   \*   \*." Clearly those skilled in the art would seek ways, as did appellant, to mitigate such effects.

5. E.S.R. (erythrocyte-sedimentation rate) is high in the presence of rheumatic activity, falls off with declining rheumatic activity.

As to properties, appellant argues that his composition exhibits unexpected synergism. Synergism is one factor to be considered in the ultimate determination of obviousness of the composition. However, we attribute no magic status to synergism per se since it may be expected or unexpected. On the record before us, we see nothing "unexpected" in appellant's synergism. The specification's four examples concededly show that combined salicylate-prednisone/prednisolone therapy results in synergistic anti-inflammatory effects while reducing undesirable hormonal side effects. However, nothing in the record shows that similar synergism is not attained by Holt et al. or by using "Salcort."[6] Apparently cortisone, hydrocortisone, prednisone and prednisolone all function in a similar physiological manner to reduce inflammation and provoke undesirable side effects.[7] Holt et al. got superior anti-inflammatory effects using combined therapy with no report of undesirable side effects; we see no reason why one skilled in this art would not expect even better results with prednisone or prednisolone since Bunim et al. and Drug Trade News teach prednisone and prednisolone to be initially more potent and to exhibit lessened side effects when administered alone. In the absence of data comparing cortisone-salicylate compositions with prednisone-or prednisolone-salicylate compositions, we are not convinced that synergism of the latter compositions is unexpected. Thus we consider the appellant's composition to be obvious within the meaning of section 103.

Although neither appellant nor the Patent Office raise the point in their briefs, claims 4–7 and 8–13 define appellant's composition with greater specificity than claim 1. Nevertheless we consider these claims unpatentable. The quantity limitations of claims 4–7 do not distinguish appellant's composition from "Salcort."[8] Appellant alleges no criticality in such limitations other than the broad assertion that "it is preferred to use smaller quantities of each of the essential active ingredients in the composition than when each such active ingredient is used alone to obtain a particular therapeutic response." Apparently "Salcort" satisfies this desideratum.

As to claims 8–13 we agree with the board, which sustained the examiner stating:

"Claims 8 to 13 are directed to composition including a salicylate and prednisone or prednisolone together with certain other ingredients. Appellant has not urged any patentable significance in these additional ingredients and we find none. The prior art shows that certain antacid materials and vitamin derivatives may also be included in this type of composition."

The decision of the board is affirmed.

Affirmed.

---

6. No tests comparing "Salcort"—or any other cortisone-salicylate composition—with appellant's composition are of record. The only comparative data before us are four tables in the specification describing tests wherein claimed compositions are administered to rats. Half the data tend to show synergism in anti-inflammatory effects; the other half show lessening of adrenal atrophy by the "cancelling" effects of steroid *atrophy* and salicylate *hypertrophy*.

7. Appellant's brief states that adrenal atrophy is a major undesirable side effect of drug therapy. Apparently all four steroids in this case exhibit this side effect to varying degrees.

8. Salcort—2.5 mgs. cortisone acetate; 0.3 gms. (300 mgs.) sodium salicylate.
    Claim 4—0.25 to 2.5 mgs. prednisone or prednisolone; 150 to 600 mgs. salicylate.