55 CCPA
**Application of Norman A. MEINHARDT.**
**Patent Appeal No. 7922.**

United States Court of Customs
and Patent Appeals.
April 11, 1968.

Roger Y. K. Hsu, Cleveland, Ohio, Almon S. Nelson, Washington, D. C., Joseph F. Shekleton, William H. Pittman, Oberlin, Maky, Donnelly & Renner, Cleveland, Ohio (Donald D. Jeffery, Cleveland, Ohio, of counsel), for appellant.

Joseph Schimmel, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, SMITH and ALMOND, Judges.

SMITH, Judge.

This is an appeal from the decision of the Patent Office Board of Appeals,[1] ad-

---

1. The board consisted of Messrs. Behrens, Examiner-in-Chief, and Stone and Campbell, Acting Examiners-in-Chief. For the various views of this court on the legality of boards so constituted, see In re Wiechert, 370 F.2d 927, 54 CCPA 957, 927 (1967). Mr. Campbell wrote the opinion of the board.

hered to on reconsideration, affirming the examiner's rejection of the remaining claims of appellant's application [2] as obvious over certain prior art within the meaning of 35 U.S.C. § 103.

Two issues are presented in this appeal: (1) whether the board erred in considering the rejected claims to be obvious and therefore unpatentable in view of the prior art under 35 U.S.C. § 103, and (2) whether the board erred in refusing to regard its decision as involving a new ground of rejection, thus denying appellant an opportunity to respond fully to that rejection under Rule 196(b).

█ The disposition of the issue of "obviousness" ultimately turns, as will be seen, on the question of whether appellant's proofs relating to a zinc phosphorodithioate composition useful as an additive in lubricants shows that the composition exhibits an unexpected synergism and hence is nonobvious. We conclude, however, that appellant's evidence is insufficient to overcome the evidence of obviousness upon which the Patent Office position is based. In re Diamond, 360 F.2d 214, 53 CCPA 1172 (1966); In re Luvisi, 342 F.2d 102, 52 CCPA 1063 (1965); In re Huellmantel, 324 F.2d 998, 51 CCPA 845 (1963).

The invention relates to an admittedly novel zinc phosphorodithioate composition which is useful as a corrosion-inhibiting additive to libricants. The composition of the invention is a mixture of two separately prepared, individual zinc salts of phosphorodithioic acids. The two salts are referred to as (A) and (B) in the specification, the claims and in this opinion. The language of the claims is sufficient to identify the chemical nature of the zinc salts. The separately-prepared, individual zinc salts are mixed in a specified range of mole ratios.

Claim 14 is the broadest of the rejected claims and reads:

14. A zinc phosphorodithioate composition useful as an improving agent

in lubricants which composition is obtained by separately preparing and then mixing:

(A) the zinc salts of a mixture of phosphorodithioic acids having the structure in which $R_1$ and

$R_2$ are selected from the group consisting of lower molecular weight primary aliphatic hydrocarbon radicals having less then 5 carbon atoms and higher molecular weight primary aliphatic hydrocarbon radicals having from 5 to about 18 carbon atoms, the molar ratio of lower molecular weight radicals to higher molecular weight radicals in the zinc salt mixture being within the range of 1:1 to 6:1; and

(B) the zinc salt of at least 1 phosphorodithioic acid having the structure in which $R_3$ and $R_4$

are selected from the group consisting of primary aliphatic hydrocarbon radicals having from about 6 to about 40 carbon atoms and alkyl-substituted aromatic radicals having from about 9 to about 96 carbon atoms;

the mole ratio of A:B in said zinc phosphorodithioate composition being

**2.** Claims 2 through 14 are here in issue and are all of the remaining claims of appellant's application Serial No. 252,-

307, filed January 18, 1963, entitled "Composition."

within the range from about 1:5 to about 5:1.

Appellant raises no issue here as to the specific differences of the remaining claims, from which we conclude that the claims stand or fall together.

The references relied upon are:

| | | |
|---|---|---|
| Mikeska | 2,506,310 | May 2, 1950 |
| Goldsmith | 2,838,555 | June 10, 1958 |
| Higgins et al. (Higgins) | 3,000,822 | Sept. 19, 1961 |

---

The claims were rejected "as being obvious over Mikeska and Higgins et al. in view of Goldsmith." It may be noted that both Higgins and Goldsmith are also assigned to appellant's assignee, The Lubrizol Corporation.

Appellant does not contest that components (A) and (B), taken individually, are each known to the art. In his brief he states:

> For the present purpose, it may be admitted that *Higgins et al.* shows subject matter within component (A) of appellant's mixture and *Mikeska* shows subject matter within component (B) of appellant's mixture. Neither *Higgins et al.* nor *Mikeska* shows appellant's mixture.
>
> \* \* \* \* \* \*
>
> Inasmuch as appellant concedes that Components (A) and (B) are each individually known in the art, it is unnecessary to consider *Higgins et al.* and *Mikeska* in any detail. Suffice it to say that *Higgins et al.* is illustrative of Component (A) and *Mikeska* is illustrative of Component (B).

In his statement of the final rejection, the position of the examiner as to the efficacy of the teachings of Goldsmith was:

> \* \* \* The Goldsmith reference teaches that it is quite old in the art to use mixtures of metal salts of dialkyl dithiophosphoric acids as antioxidants and corrosion inhibitors for lubricating oil compositions. Thus this reference teaches that such mixtures can be prepared by a) reacting $P_2S_5$ with a mixture of alcohols with subsequent reaction with ZnO, b) by individually preparing the dithiophosphoric acid esters by reaction of $P_2S_5$ with individual alcohols with the subsequent reaction of a mixture of such esters with ZnO or c) by preparing the individual metal salts with subsequent mixing.
>
> Applicant has merely followed this last teaching of Goldsmith and combined two known corrosion inhibiting additives as shown by the primary references. It is the position of the Examiner that no patentable invention is involved in following prior art teachings *even if results are better than expected.* \* \* \* [Emphasis added and citations omitted.]

In response to argument filed by the appellant after the final rejection, the examiner elaborated somewhat:

> \* \* \* Goldsmith teaches that mixtures of metal salts of dithiophosphates are more effective as corrosion inhibitors than prior art material \* \* \* and that zinc salts give superior results \* \* \*. It appears that applicant has merely experimented within the bounds defined by Goldsmith to determine optimum results. Applicant has merely extended the teachings of the prior art in an obvious manner and *nothing of patentable merit can be seen in determining that in a narrow field of corrosion inhibitors which are known to be superior, one is more superior.* [Reference to particular portions of Goldsmith omitted and emphasis added.]

The board affirmed, stating:

> \* \* \* The method claimed herein appears to generally follow method (5)

of the [Goldsmith] patent, wherein appellant mixes a simple salt such as could be obtained by method (3), corresponding to appellants [sic] B, with a mixed salt prepared by method (1) of the patent (appellant's A). * * *

The language of the board may be better understood from the following specific disclosure from the Goldsmith patent:

The preparation of the dithiophosphate salt-ester material is accomplished by at least one of the following methods:

(1) The reaction of $P_2S_5$ with a mixture of alcohols, and subsequently reacting the resultant mixture with the desired basic reagent;

(2) First preparing simple acids by the separate reaction of $P_2S_5$ with each of the desired alcohols; mixing two or more of such simple acids together and then reacting the mixture with the desired basic reagent;

(3) First preparing simple acids by the separate reaction of $P_2S_5$ with each of the desired alcohols; then reacting separately each of the simple acids with the desired basic reagent, followed by mixing the desired salts together;

(4) The mixed acids of method (1) above are mixed with the simple acids of method (2) above, and then the resultant mixture is reacted with the desired reagent; and

(5) The simple salts of method (3) above are mixed with the mixed salts of methods (1) above.

Thus, Goldsmith does not disclose the particular zinc phosphorodithioate composition of appellant's invention, although methods (3) and (5) above teach generally the mixing of metal phosphorodithioates. Appellant here asserts that zinc phosphorodithioates are most commonly prepared from alcohols, phosphorous pentasulfide, and zinc oxide by certain reactions. He argues that a zinc phosphorodithioate composition can be prepared by techniques involving the use of a mixture of alcohols, a mixture of phosphorodithioic acids, or a mixture of zinc phosphorodithioates and that variations and combinations of such techniques give rise to many methods, including the five methods disclosed in Goldsmith.

Appellant thus concludes that a metal phosphorodithioate product prepared by one method may be identical in empirical and overall chemical composition with another product prepared by a different method. Appellant states that the two products will not be identical in respect to their precise composition, i. e., they will differ in the arrangement of the organic groups, the presence or absence of some individual components, and the specific distribution of the individual components. Thus, appellant asserts that their diffeernce cannot be characterized except in terms of the particular methods by which the products are prepared.

It can be seen that appellant's claims specify that the components (A) and (B) must be separately prepared and then mixed. Since Goldsmith *prefers* methods (1) and (2) above, which involve the use of a mixture of alcohols and a mixture of phosphorodithioate acids, respectively, appellant argues that Goldsmith thus regards methods (3) and (5) as not being preferred. As noted above, those methods generally relate to separately preparing metal phosphorodithioates and then mixing them.

■ We do not perceive the significance of this argument. All of the disclosure of the Goldsmith reference must be considered for what it fairly teaches one of ordinary skill in the art. In re Boe, 355 F.2d 961, 53 CCPA 1079 (1966). Indeed, that disclosure is pertinent to a determination of the scope and content of the prior art. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed. 2d 545 (1966). We thus conclude that the pertinence of "non-preferred" disclosure must likewise be reviewed in the light of what it teaches to one of ordinary skill in the art.

We turn now to the differences between appellant's claims and the prior

art. Initially, it may be observed that appellant raised no issue here, or below, with respect to the mole ratio of the components specified in the claims.

The Goldsmith reference does not specifically disclose the particular zinc phosphorodithioate composition of the rejected claims, nor does it mention any phosphorodithioates in which the organic radicals are alkyl-substituted aromatic radicals. While that reference illustrates mixtures of metal phosphorodithioates by specific examples in Table II, only one example is a mixture of two *zinc* phosphorodithioates. That example is a mixture of "zinc di-(hexylcyclohexyl) dithiophosphate" and "zinc (ethyl) (propyl) dithiophosphate"; and that mixture is different from the mixture of appellant's invention.

However, we agree with the solicitor that the teachings of the Goldsmith reference render appellant's claims at least prima facie obvious. By way of illustration, example 8 of Table II of Goldsmith also points toward the obviousness of the composition of claim 14. That example relates to a mixture of cadmium di-lauryl dithiophosphate and strontium (ethyl) (amyl) dithiophosphate. Accordingly, in view of the prominence accorded to zinc by Goldsmith, as well as by Higgins, which is concerned solely with zinc salts of phosphorodithioates, these two patents would suggest the mixture of zinc salts corresponding to the mixed salts of example 8.

Goldsmith specifically mentions that:

For certain uses, and particularly as lubricant additives, superior results have usually been obtained when the salt-forming radical employed in the preparation of dithiophosphate salt-ester materials of the present invention is selected from the metals in group II of the periodic table of elements, and especially where the salt-forming radical is zinc. Further, it has been found that dithiophosphate materials which have an average of from 8 to 9.6 carbon atoms per atom of phosphorus will be found to be preferable for many uses.

Thus, in the light of that teaching, the ethyl and amyl radicals in the examples of Goldsmith would correspond to $R_1$ and $R_2$ of component A of the claim, having 2 (less than 5) and 5 (from 5 to about 18) carbon atoms, respectively, and "dilauryl" of example 8 corresponds to $R_3$ and $R_4$ of component B of the claim, where $R_3$ and $R_4$ are the same, and each is a primary aliphatic hydrocarbon radical having 12 carbon atoms.

Thus, the substance of our position at this juncture is that we agree with the Patent Office that the prior art establishes a prima facie case of obviousness under 35 U.S.C. § 103. Our inquiry now is directed to the ultimate issue of whether appellant's evidence overcomes the position of the Patent Office. The appellant's position is that the factual showing in the record clearly demonstrates that the claimed composition has unexpected properties. We turn now to a discussion of that evidence.

The factual showing consists of two sets of performance data, each comparing the claimed zinc phosphorodithioate composition with products of the prior art. The data are said to demonstrate synergism in the claimed composition. They show that the claimed composition which is obtained by separately preparing and then mixing component (A) and component (B) (zinc di-(Oxo-octyl) phosphorodithioate), is more than twice as effective to impart corrosion inhibiting properties to lubricants as each of components (A) and (B) alone.

Similarly, the data are also said to demonstrate the properties of another claimed composition in which component (B) is a zinc salt of an "alkyl-substituted aromatic" phosphorodithioic acid. Thus, the data show that the claimed composition, which is obtained by separately preparing and then mixing component (A) and component (B) (zinc di-(heptylphenyl) phosphorodithioate), is more effective than each of components (A) and (B) alone.

The examiner seemed to recognize that the results were "better than expected," as exemplified by the underscored por-

tion of his final rejection above, and seems further to have maintained that position in his letter after the final rejection.

In his Answer, the examiner stated that he did not dispute the data shown either in the specification, which we previously discussed, or in the affidavit filed under Rule 132, which we will discuss later. As heretofore indicated, Goldsmith contemplates the use of mixtures of metal salts, as evidenced by method (5), and Table II therein. The reference further teaches that such mixtures give superior results. In this respect, the specification of Goldsmith states:

* * * After having unexpectedly found that stable, oil-soluble salt-esters could be economically produced in this novel way, another program was conducted to determine the effectiveness of the new salt-ester materials as corrosion inhibitors. The result of this undertaking quite unexpectedly showed that in order to obtain the same corrosion-inhibiting effect of a high molecular weight hydrocarbon-substituted salt-ester, it actually took a smaller amount on a weight basis of the novel salt-esters of this invention. This discovery is extremely important, because salt-esters are sold on a weight basis for use in lubricants.

Therefore, it is now possible, by means of the present invention to provide novel salt-ester materials which are economical to produce and are also more effective than the heretofore known oil-soluble salt-esters as corrosion inhibitors in lubricants, on a given weight basis.

From these and other portions of the Goldsmith reference, the examiner in his Answer concluded:

Goldsmith does suggest that mixtures of metal salts of dithiophosphates would be synergistic. He teaches that smaller amounts of such mixtures give equivalent or better results than a larger amount of prior art metal salts * * *.

We agree with the position of the solicitor, as set forth in his brief:

* * * Appellant has not challenged these findings by the examiner, in his brief. These findings, read in the light of the examiner's entire answer, suggest that the examiner was of the opinion that the combined prior art teachings made the claimed invention so obvious that only a much stronger showing of unexpectedly improved results than that presented, would have sufficed to render unobvious the subject as a whole of claim 14. * * * In re Umbricht, 52 CCPA 1586, 1592, [347 F.2d 882, 886], 146 USPQ 214, 218 [1965], demonstrates the legal soundness of the examiner's position.

In *In re Huellmantel,* supra, this court pointed out that properties of compositions involving the admixture of two or more compounds must be considered in determining obviousness under 35 U.S.C. § 103. There, as here, the examiner apparently conceded that appellant's composition showed "improved results." There, the reference gave at least a hint of synergism, whereas here the suggestion of synergism is much stronger. We viewed the matter of synergism as a property to be considered as follows, 324 F.2d at 1003, 51 CCPA at 850.

As to properties, appellant argues that his composition exhibits unexpected synergism. Synergism is one factor to be considered in the ultimate determination of obviousness of the composition. However, we attribute no magic status to synergism per se since it may be expected or unexpected. On the record before us, we see nothing "unexpected" in appellant's synergism. * * * However, nothing in the record shows that similar synergism is not attained by Holt et al. or by using "Salcort."

There we also noted that no tests comparing the composition of the prior art with the appellant's composition were of record.

In *In re Luvisi,* supra, we applied the "dictate" of *Huellmantel* and inquired as to what properties of the claimed invention had been shown. There, as here, appellant contended that synergism was clearly demonstrated while the solicitor contended that such a finding was within the teaching of the prior art reference. There, we stated, 342 F.2d at 109, 52 CCPA at 1072:

> We do not accept the notion that every suggestion of synergism in the art coupled with a finding of synergism in the practice of the invention *automatically* compels a conclusion of obviousness. * * * [A] synergistic composition could well be *un*obvious even though "synergism" is suggested in the prior art. For example, the claimed compositions may be *many times more synergistic* than any of the prior art compositions. Again, some prior art compositions may show little synergism and others show considerable synergistic effects, with the net result that predictability is impossible save the fact that a synergistic result *of some kind* will probably be found. The situation before us is a blend of these two examples, i. e., the prior art compositions display less synergism than the claimed invention and, more importantly, they display such a variation in degree of synergistic effects that predictability is impossible.

Thus, as in *In re Diamond,* supra, the question of nonobviousness must turn on whether the prima facie case of obviousness of the claimed composition is rebutted by a showing of unexpected results.

In an attempt to achieve this showing, appellant filed an affidavit under Rule 132. The data demonstrate that appellant's zinc phosphorodithioate composition (Test Sample III) is about twice as effective as analogous compositions prepared in accordance with Goldsmith's "method (1)" (Test Sample I) and "method (2)" (Test Sample II). These data, according to appellant, brought into sharp focus the critical significance in the particular method by which appellant's zinc phosphorodithioate composition is prepared. The products in the three test samples are identical except for the methods of their preparation; that is, they have analogous empirical compositions and they are derived from the same reactants employed in the same relative proportions.

The examiner considered that affidavit as not persuasive in view of the teaching of Goldsmith. The board likewise took a dim view of appellant's showing, stating:

> * * * Absent unexpected results for mixing the specific mixed salts of Higgins et al. with the specific simple salts of Goldsmith or Mikeska, using a method taught by Goldsmith, [it] appears to us to be obvious to do so. While appellant points to Table III on page 22 as evidence of an unexpected result, we do not find that it is sufficient to show any different results for the specific compositions of claims 9 and 10 than might be obtained for many other mixtures produced by method (5) of Goldsmith. *A fortiori,* it does not establish unexpected results for appellant's broader claims over other mixed products which the art suggests.

At oral argument, appellant's counsel asserted that the claimed invention was better than products having the same empirical composition and made by other methods. The data presented by appellant were directed to methods (1) and (2) of Goldsmith. At oral argument, appellant thus admitted that the product of appellant's invention was achieved by following method (5) of Goldsmith.

■■ This, in our view, is the fatal deficiency of appellant's evidence before the Office. If he is to prevail, he must show that whatever improvement he made over the prior art was unobvious, as well as novel and useful. If he merely followed the teachings of the prior art or obvious variants thereof, he, of course, would not be entitled to a patent under the statutes. If, however, he discovered a composition which, in contemplation of

law, would have been unobvious when tested against the standard of one of ordinary skill in the art, he should prevail. In this case, to achieve that latter position, he must produce evidence that his results were "unexpected" when compared to the results achieved by the prior art.

Thus, while we do not agree with the broad sweeping statements of the examiner with respect to results, we conclude that the position of the Patent Office was basically sound. Had appellant provided a broader base of probative evidence before the Office, he would, in the words of the solicitor, have been in a "better" position. On this record, we are thus disposed to affirm the decision of the board.

Appellant contends that the board's holding that his evidence, or showing of facts, was insufficient to overcome the prior art rejection was a new ground of rejection, contrary to the position taken by the examiner, and that "a full opportunity to answer it should be afforded appellant." It is pertinent to note here that in its supplementary decision, the board asserted that the rejection as expressed by it in its principal decision "remains the same rejection on the same references under 35 USC 103, and this is not a new ground of rejection." [3]

 Considering the merits, the board relied on the same references as the examiner to sustain the rejection. Assuming arguendo that the board relied upon a portion of the Goldsmith disclosure ignored by the examiner, this could not constitute a new ground of rejection in view of In re Azorlosa, 241 F.2d 939, 44 CCPA 826 (1957), which holds, in pertinent part, that it is proper for the court and necessarily, the board, to con-

sider everything that a reference discloses.

Thus, the decision of the board is affirmed.

Affirmed.

A mere statement that the evidence presented is insufficient to support arguments is not a new ground of rejection nor does it clearly invite the presentation of additional data.
See In re Maloy, 328 F.2d 933, 51 CCPA 1081 (1964).

---

3. In response to the board's supplementary decision, appellant petitioned the Commissioner to reopen prosecution of the application to permit him to present the data the board thought necessary to support his position. On referral to the Acting Director of the Chemical Examining Operation, the latter denied the petition holding that: